# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40335**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Julian L. L. CORNWELL**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 16 October 2023

————————————

*Military Judge*: Shad R. Kidd.

*Sentence*: Sentence adjudged 11 May 2022 by GCM convened at Hill Air Force Base, Utah. Sentence entered by military judge on 4 July 2022: Dishonorable discharge, reduction to E-3, and a reprimand.

*For Appellant*: Major Matthew L. Blyth, USAF; Major David L. Bosner, USAF.

*For Appellee*: Lieutenant Colonel G. Matt Osborn, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, DOUGLAS, and WARREN, *Appellate Military Judges*.

Judge DOUGLAS delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge WARREN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

DOUGLAS, Judge:

Contrary to his pleas, a general court-martial composed of officer and enlisted members convicted Appellant of one specification of sexual assault and one specification of abusive sexual contact both in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] Appellant was sentenced by members to a dishonorable discharge, hard labor without confinement for three months, reduction to the grade of E-3, and a reprimand. The convening authority took no action on the findings. The convening authority disapproved the hard labor without confinement and approved the remainder of the sentence.

Appellant raises two assignments of error which we have reworded: (1) whether the evidence was legally and factually sufficient to support his convictions for sexual assault and abusive sexual contact; and (2) whether he was denied his constitutional right to a unanimous verdict.[3] We have carefully considered issue (2) and determined it warrants no discussion or relief. *See United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023); *United States v. Guinn,* 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)).

We find Appellant's convictions for sexual assault and abusive sexual contact are legally and factually sufficient. We find no error materially prejudicial to Appellant's substantial rights.[4] Accordingly, we affirm the findings and the sentence.

---

[1] All references in this opinion to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of one specification of assault consummated by a battery of HC, charged in violation of Article 128, UCMJ, 10 U.S.C. § 928.

[3] Legal sufficiency and issue (2) were raised by Appellant personally pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] We note that Prosecution Exhibit 5 for identification, which was offered, but not admitted, is missing from the record. *See* R.C.M. 1112(f)(2) (requiring exhibits marked for and referred to on the record but not received in evidence, be attached to the record of trial before forwarding the record for appellate review). The exhibit was a "no contact order" offered by the Government in sentencing, which the military judge excluded after determining it did not meet the requirements of R.C.M. 1001(b)(2) and had a danger of unfair prejudice under Mil. R. Evid. 403. Although the missing exhibit was a required appellate attachment, we do not find this missing exhibit "qualitatively or quantitatively" substantial. *See United States v. Davenport*, 73 M.J. 373, 377 (C.A.A.F.

## I. BACKGROUND

Appellant entered the regular component of the Air Force in March 2016. He married HC in July 2016, and they moved to Utah in October 2016, when Appellant was assigned to Hill Air Force Base. During the timeframe of the offenses, they lived on the installation with their three children.

### A. Sexual Assault

On or about 23 October 2019, HC was prescribed trazodone to assist her with sleep. After initially being prescribed 50 milligrams per dose, which turned out to be ineffective, HC's prescription dosage was increased to 100 milligrams, which was effective. HC testified that she felt the effects of this increased dose within 30 minutes. She explained the effects included drowsiness, numb hands, and crossed eyes. She became unable to focus. HC would ensure Appellant was aware she had taken her sleep aid so that he could care for their three young children, should any of them awake during the night. A pharmacist, Major (Maj) AC, testified that the effects HC described were commonly reported. Further, Maj AC explained the effects of the medication are experienced between 30 and 120 minutes after ingestion, depending upon whether the person had eaten.

In the fall of 2019, after HC's medication had been increased to 100 milligrams per dose, Appellant came home from work and asked HC if they could have sex. She said no because their children were awake and otherwise unoccupied. Later, after the children were put to bed, HC took her sleep aid. She told Appellant she had taken her medication and reminded him that she would be asleep in about 30 minutes. After she got in bed, he started to give her a back rub while she was laying on her stomach. At first, HC thought he was being nice, but when his hands moved to her shorts, she realized he was making a sexual advance. He tried to pull her shorts off, but she "swatted" his hands away and told him, "[n]o, not tonight."

HC fell asleep and her next memory is waking up in the same position, lying on her stomach, and realizing her shorts were no longer on, Appellant's penis was inside her vagina, her hands were pinned above her head, and his body was on top of hers. After about 30 seconds, she fell back to sleep. Her next memory is waking up again, this time on her back, and Appellant was using a towel to wipe her leg and vagina. He began to put her shorts back on her, but she grabbed them and pulled them up herself. He left the room, and she fell back to sleep, crying to herself.

2014) (quoting *United States v. Lashley*, 17 M.J. 7, 9 (C.M.A. 1982)). Additionally, Appellant has not alleged any prejudice from this omission, and we find none.

Maj AC explained that while there is a wide range of experiences reported by consumers of trazadone, the reports were consistent in that patients did not experience a "blackout" state of mind. If awoken after taking trazadone, they reported knowing they had been awoken, even if remaining drowsy, and knowing what caused them to awake. Additionally, the peak effectiveness of the medication was the same as the onset, within the first 30 to 120 minutes.

The next day, HC confronted Appellant in their home, asking him, "What happened last night?" He stated that he thought she was "pretending to [be] asleep," but when he realized she was not pretending, he stopped. He had no answer when she asked him why he would need to clean her, unless he had ejaculated, which would indicate that he had not stopped. The next day, HC visited her friend, Mrs. AC, and told her what had happened. Mrs. AC described HC's appearance and demeanor: HC's eyes looked puffy, her shoulders were forward, and she looked "stressed." Later the same day, while HC was still at Mrs. AC's home, Appellant brought their children to Mrs. AC's home. Mrs. AC described how she witnessed Appellant and HC interacting and testified that she overheard Appellant say "I'm so sorry" a couple times but she did not hear the context of the conversation. Despite this incident, HC and Appellant continued to live together, and decided to work on their marriage.

HC did not report to law enforcement that she had been sexually assaulted. However, after returning from a family vacation in December 2020, HC determined her marriage to Appellant was irretrievably broken. After discussing terms of separation, HC moved out of their shared home in April 2021 with their children.

**B. Abusive Sexual Contact**

On or about 1 May 2021, Appellant brought some household items from their house on base to an apartment HC was renting. One item was an accent chair HC could not carry on her own. Appellant carried the chair to her bedroom in the apartment and then hugged her around her arms and torso at the same time. Appellant continued hugging HC tightly enough to squeeze her while picking her up and throwing her onto the bed. All the while, HC protested, and became fearful about what the Appellant intended to do by his actions. At trial, Appellant was acquitted of "unlawfully squeez[ing] the arms and torso of [HC] . . . with his arms."

As Appellant and HC were walking back to his truck parked outside her apartment, he used both of his hands and touched her buttocks.[5] At the same time he stated, "Oh, the things I'd do to you." HC testified she did not want any sexual contact with him since she had moved out and they were discussing divorce terms. After he left, she took a picture of herself which she posted on a social media website with a caption stating, "It's a shame that it has to be said, but no means no. End of story." Appellant texted HC in response; the resultant conversation was admitted as Prosecution Exhibit 1:

> [Appellant]: I'm sorry[.] I shouldn't have hugged you[.]

> [HC]: It was everything. You completely betrayed me and my requests. I was saying "No. please don't. Jay stop. No[,]" and you wouldn't let me go, and that's just a trigger for me from when I was being held down crying. Or the night I told you no and you took it as me "playing" and [you] had your way with me when I fell asleep because of my medication. It's the fact you slapped my a[**] and said "oh the things I'd do to you." It's everything. It was disrespectful.

> [Appellant]: I apologize for all of it. It shouldn't have happened and it won't happen again. I pinky promise. I'm very sorry and I know how much that hurts you. I'm sorry[.] I mean it with all of my heart [and] I'm sorry[.]

Additionally, also on 1 May 2021, HC informed a friend, Ms. TH, about what Appellant had done to her earlier in the day. Ms. TH was at a children's birthday party at a park on Hill Air Force Base. HC brought her children to this birthday party and Ms. TH described HC as looking "upset." Ms. TH testified that HC explained to her Appellant had touched HC's buttocks when she told him not to touch her anymore.

## II. DISCUSSION

### A. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at

---

[5] Appellant was convicted, without variance, with "touching [HC's] buttocks, with his hand with an intent to gratify his sexual desire, without her consent;" however, HC's testimony at trial was that Appellant "slapped" her with "both of his hands."

trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied,* 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "the standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration and citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 1641 (2019).

"The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Rodela*, 82 M.J. at 525 (alterations in original) (citation and quotation marks omitted). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

Appellant was convicted of sexual assault, in violation of Article 120, UCMJ. The Government was required to prove three elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon HC, by penetrating her vulva with his penis; (2) HC was asleep; and (3) Appellant knew or reasonably should have known that HC was asleep. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(e). "Sexual act" as charged here means "the penetration, however slight, of the penis into the vulva." *MCM*, pt. IV, ¶ 60.a.(g)(1)(A).

"[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted). This includes using circumstantial evidence to prove an accused's knowledge. *See United States v. Curtin*, 26 C.M.R. 207, 213 (C.M.A. 1958).

Appellant was also convicted of abusive sexual contact, in violation of Article 120, UCMJ. The Government was required to prove two elements beyond a reasonable doubt: (1) Appellant committed sexual contact upon HC, by touching her buttocks with his hand; and (2) Appellant did so without the consent of HC. *See MCM*, pt. IV, ¶ 60.b.(4)(d). "Sexual contact" as charged here means "touch[ing], either directly or through the clothing, the . . . buttocks of any person, with the intent to . . . gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 60.a.(g)(2).

> "[C]onsent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent. Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the [appellant] in the conduct at issue does not constitute consent.

*MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

An appellant may raise an applicable defense to an accusation of sexual assault or abusive sexual contact. *See MCM*, pt. IV, ¶ 60.a.(f).

> [I]t is a defense to an offense that the [appellant] held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the [appellant] believed them, the [appellant] would not be guilty of the offense[s]. If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the [appellant]. If the ignorance or mistake goes to any other element requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the [appellant] and must have been reasonable under all the circumstances.

Rule for Courts-Martial (R.C.M.) 916(j)(1).

An appellant is not required to testify in order to establish a mistake-of-fact defense. *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (citations omitted). "The evidence to support a mistake-of-fact instruction can come from evidence presented by the defense, the prosecution, or the court-martial."

*United States v. Thompson*, 83 M.J. 1, 4 (C.A.A.F. 2022). In order to rely upon a defense of mistake of fact as to consent in the context of abusive sexual contact, the mistake of fact must have been both honest and reasonable. *Rodela*, 82 M.J. at 526. Once raised, the prosecution bears "the burden of proving beyond a reasonable doubt that the defenses did not exist." R.C.M. 916(b)(1).

Marriage is not a defense for any conduct in issue in any prosecution under Article 120, UCMJ. *See MCM*, pt. IV, ¶ 60.a.(f).

## B. Analysis

Appellant did not dispute at trial, and does not dispute on appeal, that the alleged sexual act and sexual contact occurred. Appellant instead attacks the credibility of HC as she described her state of consciousness during the sexually penetrative act and asserts, he did not and should not have known she was asleep. In other words, Appellant contends the Government failed to prove beyond a reasonable doubt the third element of the offense. As to the second conviction, Appellant further suggests HC either consented to the sexual contact, or that he had a mistake of fact as to HC's consent for the sexual contact. As explained *infra*, we find after reviewing the evidence in the light most favorable to the Prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. Further, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt of both convictions, including that Appellant did not have a reasonable mistake of fact defense that HC consented to being touched on her buttocks. *See Rodela*, 82 M.J. at 525.

### 1. Sexual Assault

The evidence presented at trial to prove Appellant committed sexual assault included the sworn, live testimony of HC, her prescription paperwork, a witness who saw her the day after the sexual assault, and the same text message from the Appellant saying "I'm sorry" in response to HC's accusation referencing this sexual assault.

HC testified that on the evening in question, she informed Appellant that she had taken her sleep medication. After falling asleep, she awoke to Appellant's penis inside her vagina, while lying on her stomach, and her hands pinned above her head. HC's next memory is Appellant using a towel to wipe her leg and vagina, which was his practice after ejaculation. Despite the sleep medication, HC was sufficiently able to perceive these limited moments, and recall them for the trier of fact. This abbreviated ability to perceive, and recall, was corroborated by a pharmacist, who indicated this ability was consistent

with other patient reports on the effects of this particular medication. Waking up after and while a crime is being perpetrated does not negate the crime. Finally, her demeanor the day after the sexual assault appeared to her friend as if she were "stressed" and as if she had been crying. Her friend also witnessed Appellant's interaction with HC, including overhearing Appellant state, "I'm so sorry." Finally, Appellant texted HC saying he was "sorry."[6]

At best, Appellant offers that he thought HC was not actually asleep, but was instead, pretending to be asleep when he started having sex with her. If true, Appellant would have us conclude that he initiated, and then continued, intercourse with his spouse, who was pretending to be asleep throughout the entire event of sexual intercourse, after HC explicitly told him, "No, not tonight," and did not participate in the sexual conduct. This explanation is unreasonable, and the members were free to discount it. We find Appellant's conviction for sexual assault both legally and factually sufficient.

### 2. Abusive Sexual Contact

The evidence presented at trial to prove Appellant committed abusive sexual contact upon HC included the sworn, live testimony of HC, a witness who established HC's demeanor the same day, and the same text message from the Appellant saying "I'm sorry" in response to HC's accusation referencing this abusive sexual contact.

In defense, Appellant would have us conclude that either HC consented, or that he misunderstood her desires for sexual touching because they were still married. As to the first point, HC testified that she did not consent. As to the latter point, on appeal he refers to the abusive sexual contact as an "innocent butt touch between husband and wife"—as if their marital state was a defense or gave him permission. As a matter of law "[a] current or previous dating or social or sexual relationship by itself . . . does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A).

Further, context is helpful when interpreting any possible mistake of fact as to consent. Here, the context is that Appellant touched HC's buttocks on a day they were solidifying the end of their relationship. Appellant was physically assisting HC by moving household items into her new apartment. A day which, in the mind of a reasonable and objective observer, would not indicate

---

[6] Although the Appellant's apology communicated via text does not necessarily amount to an admission of a crime, the apology does communicate consciousness of guilt. *See United States v. Prasad*, 80 M.J. 23, 32 (C.A.A.F. 2020) (citing *United States v. Tovarchavez*, 78 M.J. 458, 469 (C.A.A.F. 2019)).

receptivity by HC to sexual intimacies with her estranged husband. Amid discussing divorce terms, Appellant took the opportunity that physical proximity provided him and used his hands to touch her buttocks, and stated, "[O]h, the things I would do to you."

Later the same day, HC brought her children to a birthday party and appeared upset. Her friend asked her why she was upset, and she explained the circumstances of Appellant's abusive sexual contact upon her earlier that day.

Even if honest, Appellant's belief that touching HC's buttocks with his hand on 1 May 2021 was not reasonable. We find Appellant's conviction for abusive sexual contact both legally and factually sufficient.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court